UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 9:15-CV-80576-Rosenberg-Brannon

**HAWK TECHNOLOGY SYSTEMS, LLC,**

       **Plaintiff,**

  v.

**BARRETT-JACKSON AUCTION
COMPANY, L.L.C.,**

       **Defendant.**

## DEFENDANT BARRETT-JACKSON AUCTION COMPANY, L.L.C.'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6) AND MEMORANDUM OF LAW IN SUPPORT

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Barrett-Jackson Auction Company, L.L.C. ("Barrett-Jackson") moves to dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted. In support of the Motion, Barrett-Jackson states as follows:

### INTRODUCTION

This lawsuit is one of over 100 virtually identical patent infringement actions filed by Plaintiff, Hawk Technology ("Hawk"). Hawk is a non-practicing entity—a corporation that exists for the sole purpose of owning and enforcing patent rights related to the now-expired United States Patent Number RE43,462 (the "'462 patent"). To that end, Hawk has filed boilerplate complaints in federal courts across the country—each apparently filed in order to extract payments from companies that use any type of video security system in their businesses. And despite the large number of lawsuits it has filed, Hawk has never proved infringement '462 patent or defended its validity on the merits.

It is against this backdrop that Defendant Barrett-Jackson files this Fed. R. Civ. P. 12(b)(6) motion to dismiss on the grounds that the '462 is invalid for failure to claim patentable subject matter under 35 U.S. § 101. Not every purported invention is entitled to receive patent protection, and the Supreme Court has recently reaffirmed that an "abstract idea" is not patentable. The '462 patent claims an abstract idea. On its face, the '462 patent is directed to the abstract idea of receiving, displaying, and storing video images. The patent was issued at a time when the controlling test for determining patent eligibility under Section 101 was far more lenient than it is today. Under more recent Supreme Court precedent, the courts have repeatedly struck down patents claiming abstract ideas devoid of "inventive concepts." *See Bilski v. Kappos*, 130 S. Ct. 3218, 3229-30 (2010); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293-94 (2012); *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014). Because the asserted claim of '462 patent is directed to a naked abstract idea, this Court should strike down the patent as invalid and dismiss the case with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.      Factual Background**

Barrett-Jackson is a Scottsdale, Arizona based company and a leader in collector car auctions and automotive lifestyle events. [DE 1-1] As part of its operations, Barrett-Jackson operates a number of video surveillance systems at its collector car auctions, including security cameras to help provide security for the high value collector cars.

Approximately three weeks after its April 2015 Palm Beach, Florida collector car auction, Hawk filed (on May 5, 2015) a boilerplate Complaint against Barrett-Jackson, alleging that Barrett-Jackson infringes the '462 patent. The Complaint provides no details regarding any alleged infringement, but instead makes the conclusory assertion that Barrett-Jackson infringes

by employing some kind of video surveillance system. The Complaint is one of over 60 current lawsuits filed by Hawk alleging infringement of the '462 patent. [DE 1-3].

## II. The '462 patent

The '462 patent[1] (attached as Ex. A) is generally drawn to systems and methods for receiving, displaying, and storing video images. '462 patent at 1:19–23. As discussed more fully below, the asserted claim 12 (and its dependent claims) recite only a method for receiving, displaying, and storing video images—that method carried out on generic, off-the-shelf components. The claimed "invention" utilizes known techniques and equipment to receive and then monitor multiple video images on a single screen simultaneously, while recording the images. *Id*. at 3:54–4:6. It implements the well-known idea by using "an automated video monitoring system by way of a PC-based platform employing display windowing software" and further with "camera sources being interfaced to an input circuit board . . . for image data compression." *Id*. at 4:37–41.

### A. Claim 12 and its dependent claims

Hawk alleges that Barrett-Jackson infringes claim 12 or one or more claim 12's dependent claims. (Dkt. 1 (Pl.'s Compl). at 1.) Claim 12[2] states:

> 12. The method of simultaneously displaying and storing multiple video images, comprising the steps of:
>     receiving video images at a personal computer based system from one or more sources;
>     digitizing any of the images not already in digital form using an analog-to-digital converter;

---

[1] The USPTO uses "RE" to designate patents that underwent a reissue procedure. The original patent issued as U.S. Pat. No. 5,625,410.

[2] The '462 patent is a reissue of an earlier patent. Text in the patent enclosed in heavy brackets appears in the original patent but forms no part of the reissue specification. Text in italics indicates the additions to the specification made by the reissue application. *See generally*, 37 C.F.R. 1.173; MPEP §1453. Here, the bracketed material and italics from the reissued claim have been omitted for clarity, so that only the text from the reissued claim appears.

3

>> displaying at least certain of the digitized images in separate windows on a personal computer based display device, using a first set of temporal and spatial parameters associated with each image in each window;
>> converting one or more of the video source images into a data storage format using a second set of temporal and spatial parameters associated with each image; and
>> simultaneously storing the converted images in a storage device.

'462 patent at 11:62 – 12:10.

Claim 12 generally relates to the abstract concept of receiving, displaying and storing multiple video images. The method is performed using generic, off-the-shelf components referenced in the claim (e.g., "personal computer," "analog-to-digital converter," "display device," and "storage device"). Claims 9, 13, and 14 relate generally to setting frame rate and image dimension — also well-known concepts in the video monitoring and recording space, and none of which confer subject matter eligibility to the otherwise ineligible claim 12. *Id.*, at 1:51–2:7; 6:56–59; 11:55–57; 12:11–14. Claims 19–21 recite a generic network connection, generic storage mediums, and a generic display device, respectively. *Id.* at 2:49–59; 6:22–30; 7:9–16; 9:36–47; 12:58–13:3.

### B.     Exemplary embodiments

The '462 patent offers examples of the various types of generic and well-known components and methods that can be used to practice the method of claim 12. Figures 1–6 of the '462 patent demonstrate various layouts for displaying a number of video images on a single monitor. For example, Figure 1 shows a possible display resolution that can be used to implement the methods set forth in the patent.



Figures 2–5 similarly depict other possible configurations for the monitors to be used. The '462 patent does not purport to have invented a novel monitor. Instead, the descriptions of Figures 1–6 describe possible display resolutions and recording limitations for any number of commercially available monitors to be used with conventional recording equipment and generic software. *See* '462 patent at 4:37–5:67. These video feeds are provided via a generic "PC-based platform employing display windowing software" — no specific PC-based platform or specific windowing software is disclosed. *Id*. at 4:37–39.

The disclosure of generic and commercially available components extends to Figures 7–10, which depict functional diagrams of such components that may be used to implement the system. For example, Figure 7 is drawn to "a functional diagram of an analog input digital processing card" that "can be obtained from such manufacturers as Nova, Model No. V-SW[.]" *Id*. at 6:41–45. This is an example of a commercially available product used to perform the well-known task of converting analog signals to digital ones, conditioning the signals for display, and transmitting the signals through conventional equipment.



Many of the other figures likewise depict additional generic hardware that could be used to implement the abstract idea. Figure 8 is a functional diagram of a "digital input/output digital processing card" that can be used in communication methods utilizing "common" and "well known" interfacing technology. *Id*. at 7:4–16; 7:32–34. Figure 9 is a diagram of "a digital output universal camera adapter," described as being a digital version of a known camera adapter. *Id*. at 7:41–46. This known adapter "accepts analog audio and video signals from the camera 102, and converts them to digital signals[.]" *Id*. at 7:48–49. No special method of conversion is discussed. Figure 10 depicts "an integrated camera system" comprising a generic camera, generic A/D converter, and generic circuitry. *Id*. at 8:11–17. The '462 patent does not explain in detail any of the circuitry and includes no circuit diagrams for this component, and thus clearly implies that generic, off-the-shelf electronic components in conventional arrangements would suffice. Finally, Figures 11–14 depict exemplary arrangements for any commercially available video system.

### C. The '462 patent's attempt to fix problems with the prior art.

Initially, the '462 patent explains that "existing systems for monitoring video signals from multiple sources either have relied upon switching means to sequence through each of the sources in a predetermined pattern, or else implement some form of "split screen" display[.]" *Id*. at 1:27–30. According to the '462 patent, such systems, and methods of using these systems,

"are well known in the art." *Id*. at 1:36–37. The specification then identifies problems with such conventional systems, including problems with the methods used to implement the systems. *Id*. at 2:36–48. For example, the specification explains that some prior devices had diminished signal quality resulting from analog inputs. *Id.* Another problem is loss of recording efficiency resulting from using automatic video switcher units in conjunction with a time-lapse video recorder. *Id*.

Most of the cited problems stem from the prior art's use of an analog-based system and methods used to implement those systems. To solve these problems, the '462 patent discloses the use of a system that utilizes "an automated video monitoring system by way of a PC-based platform employing display windowing software[.]" *Id*. at 2:66–3:1. The '462 patent further provides "camera sources being interfaced to an input circuit board which includes provisions for image data compression." *Id*. 3:1–3. The system also includes storage functionality that can include "a tape back-up device," or "disk storage devices[.]" *Id*. at 3:30–35.

The '462 patent purportedly fixes the prior art problems by replacing the old analog system, with a newer digitally based one. Claim 12 of the patent recites the method for implementing the digital system. Thus, the patent uses a computer platform to coordinate and format the incoming video images, where previously these tasks were performed with a plurality of analog devices. *See id*. at 3:54–57 ("It is an object of the invention to provide a more efficient method for monitoring camera outputs by means of a multiple-window display system implemented on a computer platform."). The benefits touted by the '462 patent stem from the use and implementation of the digital system—one that is common and well-known in the field. For example, using a digital PC-based platform to monitor multiple camera feeds allows a user to "observe the various display windows on the monitor screen, rather than concentrate on many

7

monitors simultaneously[.]" *Id*. at 6:7–9. Another disclosed advantage of the digital system is that it does not require a video switcher (which is needed in analog systems), thus eliminating the risk of missing events "due to the sequential switching of input images." *Id*. at 6:10–15. A further disclosed advantage (that arises in mostly all digital systems) is that the digital system "improves the signal quality," prevents "loss of quality during recording or playback," and allows other data to be recorded "such as audio, time, date, location, etc." *Id*. at 6:15–21. Finally, the '462 patent states that using a PC-based platform allows for advantages in storage options well-known in the art. *Id*. at 6:22–33. These advantages are attributable to using a digital, rather than an analog, implementation.

## ARGUMENT

Under the Supreme Court's recent precedent, the '462 patent does not meet the minimum threshold for subject matter patent eligibility because it is merely directed to an abstract idea. The asserted claim of the patent is drawn to a method for receiving, displaying, and storing video images. There is nothing "inventive" about the claimed method. The idea of receiving, monitoring and recording video images was well known before the '462 patent, and the '462 patent does no more than claim a digital implementation of the idea through the use of generic computer components. Where, as here, a claim is directed to such an abstract idea and lacks an inventive concept, the Court must deem it invalid and dismiss the suit.

**I.  Dismissal based on Section 101 is appropriate at the pleading stage.**

"Whether a claim is drawn to patent-eligible subject matter under §101 is a threshold inquiry" and "an issue of law" ripe for adjudication at the motion to dismiss stage. *In re Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008), *aff'd sub nom Bilski v. Kappos*, 561 U.S. 593, 602 (2010) (describing § 101 as "a threshold test."). Dismissal under Federal Rule of Civil Procedure

8

12(b)(6) is appropriate when a complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The question of whether a patent asserted in a complaint fails to satisfy Section 101 is properly decided on a Fed. R. Civ. P. 12(b)(6) motion to dismiss, where, as here, all the pertinent facts are pleaded in the Complaint and the asserted patent claims are directed to subject matter that is ineligible for patent protection. *See e.g., Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014) (affirming the district court's grant of a motion to dismiss for lack of subject matter eligibility under § 101), *Morales v. Square, Inc.*, 2014 U.S. Dist. LEXIS 178525, *8 (W.D. Tex. Dec. 30, 2014) ("Invalidity under Section 101 of the Patent Act is a question of law that may be decided on the pleadings.").

Indeed, courts often adjudicate the issue of validity under Section 101 early on to prevent unnecessary litigation. Where, as here, the plaintiff has filed suit merely to extract a settlement, an early determination of the issue is particularly important so as to "spare both litigants and courts years of needless litigation." *See I/P Engine, Inc. v. AOL Inc.*, 576 Fed. Appx. 982, 996 (Fed. Cir. 2014) (Mayer, J., concurring).  Accordingly, numerous courts have adjudicated the issue at the pleading stage.  *See, e.g., Priceplay.com Inc. v. AOL Advert. Inc.*, 2015 U.S. Dist. LEXIS 33151, at *7 (D. Del., Mar. 18, 2015) (dismissed because claims were drawn to "the abstract idea of 'a sales transaction[.]'"); *TLI Commc'ns LLC v. AV Auto., LLC*, 2015 U.S. Dist. LEXIS 18997, at *37 (Feb. 6, 2015) (dismissed because claims were drawn to "the abstract idea of taking, organizing, classifying, and storing photographs."); *Money Suite Co. v. 21st Century Ins. & Fin. Servs. Inc.*, 2015 U.S. Dist. LEXIS 8978, at *9 (D.Del, Jan. 27, 2015) (dismissed because the "core invention" of the patent was "a 'fundamental economic [or] conventional

9

business practice[]' and therefore an abstract idea."); *Eclipse v. McKinley*, 2014 U.S. Dist. LEXIS 125529, at *31–32  (C.D. Cal., Sept. 4, 2014) (dismissed because claims were drawn to numerous abstract ideas related to basic task communication procedures).

## II. *Alice* bars patent protection for abstract ideas.

35 U.S.C. section 101 ("Section 101") governs what subject matter may be afforded patent protection.  While Section 101 provides wide protection, not every "invention" is patentable.  As the Supreme Court has recently reiterated: "the [l]aws of nature, natural phenomena, and abstract ideas" are not patentable subject matter under Section 101.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2354 (2014) (citation omitted).  The "abstract ideas category embodies the longstanding rule that an idea of itself is not patentable."  *Id.* at 2355 (internal quotation marks and brackets omitted).

In *Alice Corp.*, the Supreme Court set forth a two-part test for determining whether a claim contains eligible subject matter.  First, a court determines whether the claims "are directed to a patent-ineligible concept," such as an abstract idea.  *Id.* at 2355.  If so, a court proceeds to the second step and "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application."  *Id.*  The key to the second step is to "search for an inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself."  *Id.* (internal quotes omitted).  If the claim does not include any such transformative elements, it does not contain eligible subject matter under Section 101.  *Id.* at 2360.

The "additional elements" required in step two exclude "conventional steps, specified at a high level of generality[.]"  *Id.* at 2357 (citing *Mayo Collaborative Servs. v. Prometheus Labs.,*

10

*Inc.*, 566 U.S. ___, 132 S. Ct. 1289 (2012)). Generic computer implementation of an abstract idea is insufficient to provide the requisite "additional elements." *Id*. at 2358-59.

### III.     The '462 patent claims a non-patentable, abstract idea.

The claimed invention of the '462 patent— receiving, displaying, and recording video images—is directed to a non-patentable abstract idea. Neither the asserted claim 12, nor its dependent claims, includes an inventive concept sufficient to transform the claim into a patentable invention.

#### A.     The asserted claims are drawn to an "abstract idea."

Claim 12 of the '462 patent is directed only to an abstract idea—the receiving, displaying, and recording of video images. This represents a common activity, well-known in the prior art and to the public, and falls squarely in line with other ideas held to be too abstract to garner patent protection. Such abstract ideas include, but are not limited to a method of organizing human activity" (*Bilski v. Kappos*, 561 U.S. 593 (2010)), a method for using the fundamental economic practice of using a third party to mitigate settlement risk (*Alice Corp*. at 2357), and a method for detecting and analyzing events on an electric grid (*Electric Power Grp. LLC v. Alstom, S.A., et al.*, 2015 U.S. Dist. LEXIS 67232, at *12 (C.D. Cal. May 21, 2015)). While all of these claimed "inventions" relate to different fields, they all describe "basic concepts" that are not patentable.

Importantly, a number of courts have held that ideas remarkably similar to those set forth in the '462 patent are invalid. For example, in *Electric Power*, 2015 U.S. Dist. LEXIS 67232, at *12, a district court found that a method for detecting and analyzing events on an interconnected electric grid amounted to the abstract idea of "collecting, analyzing, and displaying data from multiple sources simultaneously." The claim embodied an abstract idea despite containing limitations for analyzing and displaying data. *Id*.

11

Likewise, in *Certusview Techs., LLC v. S&N Locating Servs., LLC*, 2015 U.S. Dist. LEXIS 7126, at *47 (E.D. Va. Jan. 21, 2015), the court held that claims drawn to receiving, manipulating, and storing data related to a locate operation[3] have been found to encompass abstract ideas. There, the claims including "electronically receiving information . . . displaying such information, including the image, on a display device; . . . adding a digital representation of physical locate marks to the image; and . . . electronically transmitting and/or storing non-image data . . . to create a computer-readable file." *Id*. The court found all such ideas to be abstract because such "elements embrace the abstract process of taking input information, in the form of an image; displaying it; adding additional information to it . . . and storing such information in a computer readable file[.]" *Id.*

The abstract ideas set forth in Claim 12 of the '462 patent are indistinguishable from those cases. Similar to the method claim in *Electric Power*, claim 12 of the '462 patent is directed to obtaining data—here by receiving video images—from multiple sources and displaying the data simultaneously. And, similar to the method at issue in *Certusview*, claim 12 is drawn to taking input information (in the form of either analog or digital video images), manipulating the image in some way (in the form of digitizing the video images if not already in digital form), displaying the images using well-known computer techniques and software, and storing the information in computer readable files.[4]

---

[3] In this case, "a 'locate operation' is the application of paint, flags, or some other marking object or material to indicate the presence of an underground facility." *Certusview*, at *2.

[4] The fact that the method involves routine steps to adjust the sizing or resolution of the video feeds does not save the method from embracing an abstract idea, because these are "post solution activities." *See Parker v. Flook*, 437 U.S. 584, 589-90 (1978) ("The notion that post-solution activity . . . can transform an unpatentable principle into a patentable process exalts form over substance.").

In other words, the claim asserted by Hawk relates to a basic and fundamental idea that unquestionably does not meet the required threshold under Section 101. Claim 12 of the patent does nothing more than set forth a series of steps instructing how to engage in that receiving, displaying, and recording. As the '462 patent explains, receiving, displaying, and recording video images was a common activity prior to the '462 patent. *See* '462 patent at 1:27–37 (discussing existing systems for receiving and displaying video images from multiple sources). The '462 patent attempts to capture this routine and abstract idea by performing the activities with a PC to digitally format the video feeds for appropriate display and storage. Setting forth such a fundamental concept and providing steps in how to engage in that practice is insufficient to create subject matter eligibility under Section 101. *See Alice* (reiterating that the invalidated patent in *Bilksi* merely "involved a series of steps instructing how to [engage in the basic concept of] hedge risk."). The steps set forth in the '462 patent contain "no particular concrete or tangible form," and thus cannot be patentable material. *Ultramercial*, 772 F.3d at 715.

Nor can Hawk rely on the '462 patent's use of generic computer equipment to overcome this well-settled precedent. Claim 12 recites generic, off-the-shelf equipment to implement that claimed method – *i.e.*, a computer, an analog-to-digital converter[5], a display, and a storage device. The Federal Circuit has routinely held that the use of generic components, even where necessary to perform the method, does not confer patentability of an otherwise abstract idea. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (claims were drawn to "the abstract idea of 1) collecting data, 2) recognizing certain data . . . , and 3) storing that recognized data in a memory" despite the claims' requirement of a scanner.); *CyberFone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 Fed. Appx. 988, 992 (Fed.

---

[5] The use of this converter would not even be necessary if the video images are already digital.

Cir. 2014) ("the category of patent-ineligible abstract ideas is not limited to methods that can be performed in the human mind."). Like the Federal Circuit cases, the method of claim 12 generally involves receiving data (incoming video images), sorting or processing that data (digitizing, displaying, formatting the images), and storing the data (in a storage device). The additional generic components — even if necessary to perform the method — cannot overcome the fact that claim 12 is drawn to an abstract idea.

> **B.    The asserted claims do not contain an "inventive concept" sufficient to transform the nature of the claim into a patent eligible inventions.**

To overcome its disclosure of mere abstract concepts, the '462 patent would have to include additional elements that could "transform the nature of the claim into a patent-eligible application." *Alice* at 2355 (internal quotations omitted). The patent must show an "inventive concept" that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id*. (internal quotes omitted). But, no such inventive concept exists here.

> **1.    The generic equipment of claim 12 does not constitute an "inventive step" under *Alice*.**

Claim 12 of the '462 patent discloses generic equipment to implement the abstract idea of receiving, displaying, and recording video from multiple sources. However, an abstract idea "does not move into section 101 eligibility territory by 'merely requiring generic computer implementation.'" *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354, (Fed. Cir. 2014). As the Supreme Court has explained: "Given the ubiquity of computers, . . . wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'" *Alice*, at 2347 (brackets in original).

14

Claim 12 of the '462 patent is directed to "wholly generic computer implementation" of the abstract idea, by reciting a computer, an analog-to-digital converter, a display, and a storage device. The specification explains that these components are ubiquitous and generic. The specification does not require any particular computer system, converter, display, or storage device — any commercially available product would be suitable. For example, when describing the display to be used, the specification describes "[u]sing a *commonly available* 14″ VGA-format computer monitor with dimension in pixels of 640x480, four windows having a dimension in pixels of 320x240 may be displayed simultaneously." '462 patent at 4:66–5:2 (emphasis added). Similar language regarding generic and ubiquitous nature of the equipment can be seen in the specification regarding the disclosed computer system, converter, and storage device. *See e.g.*, *id.* at 4:44–46 ("The preferred recording medium is a 4-mm helical-scan data cartridge, commonly referred to as a digital audio tape (DAT)."); 6:44–51 ("This [analog input digital processing] card, which may be obtained from such manufacturers as NOVA, Model No. V-SW, features . . . an analog-to-digital (A/D) converter 8.").

These components are old and well-known in the prior art, as demonstrated by the specification's lack of detail regarding them. Such generic, off-the-shelf components add nothing of significance to an abstract idea. *See Alice*, at 2359 ("the claims at issue amount to 'nothing significantly more' than an instruction to apply the abstract idea . . . using some unspecified, generic computer."); *Cyberfone*, 558 Fed. Appx. at 993 ("The 'telephone' recited in claim 1 is not a specific machine, and adds nothing of significance to the claimed abstract idea.").

Moreover, the recitation of receiving, displaying, and storing multiple video images from one or more sources does not meet the "inventive concept" threshold. As described above, the

15

specification of the '462 patent admits that the idea of simultaneously receiving, displaying, and recording video images from multiple sources existed in the prior art. *See* '462 patent at 1:27–62. The fact that the inventors of the '462 patent introduced a generic computer and generic equipment to perform this known abstract idea does not prevent claim 12 from pre-empting the abstract idea. *See Alice*, at 2358 ("if a patent's recitation of a computer amounts to a mere instruction to 'implemen[t]' an abstract idea 'on . . . a computer,' . . . that addition cannot impart patent eligibility.")

### 2. No other limitations in claim 12 provide an inventive concept.

Further, the steps of "displaying" and "converting" in claim 12 do not provide the requisite an inventive concept. The "displaying" step involves displaying digital images in separate windows "using a first set of temporal and spatial parameters associated with each image in each window." '462 patent at 12:1–4 The specification discloses a "graphics processor and image data-compression engine 10" as part of the generic analog input digital processing card to perform this step. *Id*. at 6:55–56; *see also id*. at 6:41–45 (discussing commercially available analog input digital processing cards). To perform the sizing, the specification states that the graphics processor and image data-compression engine "performs the various functions required to configure the image sizes and frame rates as specified by the equipment operator." *Id*. at 6:56–59. Bandwidth is regulated by generic "computer software . . . to implement menu-driven management of the data bandwidth allocation to the various image sources." *Id*. at 61–63. The step of "displaying" is thus wholly driven by generic components and generic software — this step cannot be found to provide an "inventive concept" in accordance with relevant precedent. *See Alice*, 134 S. Ct. at 2355 (describing the "inventive concept" as "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself.").

Likewise, the step of "converting" is not inventive. This step is directed to "one or more of the video source images" and translates them into a "data storage format." '462 patent at 12:5–8. Like the "displaying" step, this step is an abstract idea that is performed by generic computer software. However, converting video images into storage format was unquestionably well-known at the time of the invention, evidenced by the specification's discussion of the prior art. *See, e.g.*, *id.* at 2:12–35 (discussing U.S. Pat. Nos. 5,237,408 and 5,258,837). Simply put, there is nothing in claim 12 than can transform the abstract ideas claimed into something "inventive" and eligible for patent protection under Section 101.

### 3. Dependent claims 9, 13, 14, and 19–21 do not include an "inventive concept."

The asserted dependent claim limitations also do not provide any transformative inventive concept. There is "no meaningful distinction . . . between the independent and dependent claims" because the "the dependent claims recite only slight variations of the independent claims." *See Planet Bingo LLC v. VKGS LLC*, 576 Fed. Appx. 1005, 1007 (Fed. Cir. 2014). In fact, each of the dependent claims (claims 9, 13, 14, and 19-21) relies on the same abstract idea that is the focus of claim 12, and only provides a minor variation on that idea.

Dependent claim 9 recites a step of receiving a command to set the frame rate and resolution for the display and storage of each image. '462 patent at 11:55–57. This additional step cannot provide an "inventive concept," because setting frame rate and resolutions was well-known at the time of the invention. *See id.*, at 6:56–59 (stating that commercially available graphics processor and image data-compression engine can alter frame rate as specified by an operator). *id.* at 6:41–45 (analog input digital processing card was commercially available).

Dependent claims 13 and 14 specify the temporal and spatial parameters claimed in claim 12. *Id*. at 12:11–14. Neither of these is a sufficient "inventive concept" as contemplated in

17

*Alice*. Defining the parameters of a frame rate and image dimension in pixels for video images was well-known in the art at the time of the invention, and is in any case an abstract idea. *Id*. at 1:51–2:7. Performing these steps using a generic computer does not move the claim into eligible subject matter territory. *See Alice*, *Content Extractions,* and *CyberFone*, *supra*.

Dependent claims 19–21 also identify additional generic components and well-known functionality. *Id*. at 12:58–13:3. Claims 19 and 20 recite a network connection and specific types of known storage media — both of which were well known at the time of '462 patent. *See, e.g.*, *id*. at 7:9–16 ("Interfacing technology for [network] communication methods are in common usage and well known in the art."); 6:22–30 (discussing various storage media recited in claim 20, such as a "magneto-optical disk"). Use of well-known, generic components does not provide an "inventive concept."

Claim 21 recites a display device associated with each source of video images, and further recites additional communication capability in functional language. *Id*. at 12:66–13:3. The function recited in claim 21 is drawn to enabling an operator to view images from one source while at the display of another source. *Id*. As discussed above, a display device is a generic component that cannot provide an "inventive concept." Further, the specification does not disclose any specific software to achieve the additional claimed functionality. Instead, it is accomplished through use of a generic computer and software to allow for remote control viewing of images. *Id.* at 9:36–47. The only difference in functionality between claim 12 and claim 21 is that claim 21 specifies that displaying can be performed at multiple displays. Providing multiple displays for monitoring is not an "inventive concept" — the specification states that such an arrangement is present in the prior art. *Id*. at 2:49–59. Accordingly, because

no inventive concepts can transform the abstract idea, the patent does not contain patent-eligible subject matter.

## CONCLUSION

For all the foregoing reasons, the Court should dismiss Hawk's complaint with prejudice.

Dated: June 29, 2015

Respectfully submitted,

/s/ *Andrew R. Kruppa*
Andrew R. Kruppa (Fla. Bar 63958)
andrew.kruppa@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
200 South Biscayne Boulevard, Suite 4700,
Miami, FL 33131
Telephone: (305) 577-7712
Facsimile: (305) 305 7001

Steven M. Auvil (PHV)
James S. Alex (PHV)
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower, 127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8023
Facsimile: (216) 479-8780
steven.auvil@squirepb.com
james.alex@squirepb.com

Rachael A. Harris (PHV)
SQUIRE PATTON BOGGS (US) LLP
2550 M. St, NW
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315
rachael.harris@squirepb.com

*Attorneys for Defendant*
*Barrett-Jackson Auction Company, L.L.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2015, I electronically filed the foregoing document and all relevant attachments with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

> */s/ Andrew R. Kruppa*
> Andrew R. Kruppa (Fla. Bar 63958)
> andrew.kruppa@squirepb.com
> SQUIRE PATTON BOGGS (US) LLP
> 200 South Biscayne Boulevard, Suite 4700,
> Miami, FL 33131
> Telephone: (305) 577-7712
> Facsimile: (305) 305 7001